# EXHIBIT 1

COMMONWEALTH COMMUNITY RECOVERY

DIVISION INC.

PAUL JONES

79NTHOMPSON STREET

SPRINGFIELD, MA 01072


MONTACHUSETT REGIONAL TRANSPORTATION AUTHORITY (MART)

100 MAIN STREET

FITCHBURG, MA 01420

November 12, 2016

Dear MART,

I am writing to ask that you remove my cell phone from your Automatic Telephone Dialing System ASAP, please call CCRD INC only  on 888-680-4667.

I am revoking all ATDS calls to my cellular telephone (617-939-5417)number as of lately I have been receiving sometimes 30-40 calls a day as early as 7 am, please remove my 617-939-5417 number as soon as possible.

I can't answer most of these calls please don't take it as I am ignoring the calls as I am driving with clients and it is difficult and dangerous to pull over every few minutes Thank you.


Paul Jones

**USPS.COM**

# USPS Tracking®

**Still Have Questions?**
Browse our FAQs ›



**Get Easy Tracking Updates ›**
Sign up for My USPS.

Tracking Number: 70162710000107775997

## Product & Tracking Information

**Postal Product:**
First-Class Mail®

**Features:**
Certified Mail™     Return Receipt

See tracking for related Item: 9590940220686132393671

### Available Actions

Text Updates

Email Updates

| Date | Status | Location |
|------|--------|----------|
| November 21, 2016 , 12:03 pm | Delivered, Left with Individual | FITCHBURG, MA 01420 |
| November 19, 2016 , 8:13 am | Available for Pickup | FITCHBURG, MA 01420 |
| November 19, 2016 , 6:40 am | Arrived at Unit | FITCHBURG, MA 01420 |
| November 18, 2016 , 12:40 pm | Departed USPS Destination Facility | SHREWSBURY, MA 01546 |
| November 18, 2016 , 8:08 am | Arrived at USPS Destination Facility | SHREWSBURY, MA 01546 |
| November 18, 2016 , 5:26 am | Departed USPS Facility | HARTFORD, CT 06101 |
| November 17, 2016 , 10:17 pm | Arrived at USPS Origin Facility | HARTFORD, CT 06101 |
| November 17, 2016 , 6:30 pm | Departed Post Office | HOLYOKE, MA 01040 |
| November 17, 2016 , 3:43 pm | Acceptance | HOLYOKE, MA 01040 |

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com*®

FITCHBURG, MA 01420     **OFFICIAL USE**

| | | 0040 |
|---|---|---|
| Certified Mail Fee $3.30 | | 06 |
| $ | $2.70 | |
| Extra Services & Fees (check box, add fees as appropriate) | | |
| ☐ Return Receipt (hardcopy) | $ $0.00 | |
| ☐ Return Receipt (electronic) | $ $0.00 | Postmark |
| ☐ Certified Mail Restricted Delivery | $ $0.00 | Here |
| ☐ Adult Signature Required | $ $0.00 | |
| ☐ Adult Signature Restricted Delivery $ | | |
| Postage $0.68 | | |
| Total Postage and Fees $6.68 | | 11/17/2016 |
| $ | | |

Sent To MART

Street and Apt. No., or PO Box No. 100 MAIN ST

City, State, ZIP+4® FitchbUrg, MA 01420

PS Form 3800, April 2015 PSN 7530-02-000-9047     See Reverse for Instructions

## Track Another Package

**Tracking (or receipt) number**

[                    ]     **Track It**

## Manage Incoming Packages

Track all your packages from a dashboard.
No tracking numbers necessary.

Sign up for My USPS ›



**COMMONWEALTH COMMUNITY RECOVERY**

**DIVISION INC.**

**PAUL JONES**

**79NTHOMPSON STREET**

**SPRINGFIELD, MA 01072**


**MONTACHUSETT REGIONAL TRANSPORTATION AUTHORITY (MART)**

**100 MAIN STREET**

**FITCHBURG, MA 01420**

February 11, 2017

Dear Crystal Geisert,

I am writing again to request that all calls to my cellular telephone be removed from MARTS Automatic Telephone Dialing System, I wrote MART some time ago and ask that CCRD INC only be called on the 888-680-4667 number, as I cannot answer 30 – 40 calls a day from MART on my cellular telephone.

CCRD INC appreciate the work but please use the 888 number only for all calls, as you Automatic Dialing System starts to call us at 7am most days with an computerized voice, this is very stressful on me as I am trying to driving clients.

The 617-939-5417 number is my personal cell phone please remove my cell number from you call list asap thank you and I hope you understand any questions please call me asap.


Paul M. Jones



UNITED STATES POSTAL SERVICE

17 FEB '17
PM 2 1

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box•

Paul Jones
79 Thompson St
Springfield MA 01109

USPS TRACKING#

9590 9403 1030 5175 8694 83

---

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

FITCHBURG, MA 01420

| Certified Mail Fee | $3.35 | | 0089 |
| | | | 07 |
| Extra Services & Fees (check box, add fee as appropriate) | | | |
| ☐ Return Receipt (hardcopy) | $ $0.00 | | |
| ☐ Return Receipt (electronic) | $ $0.00 | | Postmark |
| ☐ Certified Mail Restricted Delivery | $ $0.00 | | Here |
| ☐ Adult Signature Required | $ $0.00 | | |
| ☐ Adult Signature Restricted Delivery | $ | | |
| Postage | $0.70 | | |
| | | | 02/15/2017 |
| Total Postage and Fees | $6.80 | | |
| $ | | | |

Sent To Mart (Notice of TCPA violation)
Plates
Street and Apt. No., or PO Box No. 100 main st
City, State, ZIP+4® Fitchburg, MA

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

7015 0640 0001 5570 5341

6/20/2019                                  Gmail - Contact number for CCRD INC

 **Gmail**                                    paul jones <ccrdcorp@gmail.com>

___

## Contact number for CCRD INC
2 messages

**paul jones** <ccrdcorp@gmail.com>                         Mon, Jun 17, 2019 at 12:55 AM
To: "<rbadgley@mrta.us>" <rbadgley@mrta.us>, "Badgley, Rebecca" <rebecca.badgley@mrta.us>, "Shumovskaya, Tamara"
<tamara.shumovskaya@mrta.us>, "Jessica, Torres" <jessica.torres@mrta.us>, "Amanda-T.Kukta@MRTA.US" <Amanda-
T.Kukta@mrta.us>

   Please call us on the office number only which is 4130315-4500 or 888-680-4667 Thank you.
   **Paul Jones / Director**
   **Commonwealth Community**
   **Recovery Division Inc.**
   **79 Thompson Street**
   **Springfield, Ma 01109**
   **Cell: 617-939-5417**
   **Toll Free: 888-680-4667**
   **Fax: 888-726-8386**

   **The information in this email is intended only for the person or entity to which it is addressed from CCRD INC. and may
   contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of or taking of any
   action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you
   receive this email in error, please contact the sender and delete the material from any computers.**

___

**paul jones** <ccrdcorp@gmail.com>                         Thu, Jun 20, 2019 at 6:50 AM
To: "<rbadgley@mrta.us>" <rbadgley@mrta.us>, "Badgley, Rebecca" <rebecca.badgley@mrta.us>, "Shumovskaya, Tamara"
<tamara.shumovskaya@mrta.us>, "Jessica, Torres" <jessica.torres@mrta.us>, "Amanda-T.Kukta@MRTA.US" <Amanda-
T.Kukta@mrta.us>

   Please call us on the office number only which is 413-315-4500 or 888-680-4667 Thank you.
   **Paul Jones / Director**
   **Commonwealth Community**
   **Recovery Division Inc.**
   **79 Thompson Street**
   **Springfield, Ma 01109**
   **Cell: 617-939-5417**
   **Toll Free: 888-680-4667**
   **Fax: 888-726-8386**

   **The information in this email is intended only for the person or entity to which it is addressed from CCRD INC. and may
   contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of or taking of any
   action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you
   receive this email in error, please contact the sender and delete the material from any computers.**

   [Quoted text hidden]

# EXHIBIT 2

 **Gmail**

paul jones <ccrdcorp@gmail.com>

## Title VI Complaint

**paul jones** <ccrdcorp@gmail.com>       Fri, Jun 14, 2019 at 4:16 PM
To: "Mahoney, Bonnie" <Bonnie.Mahoney@mrta.us>, "Khan, Mohammed" <Mohammed.Khan@mrta.us>, "Fisher, Bruno"
<Bruno.Fisher@mrta.us>, "Badgley, Rebecca" <rebecca.badgley@mrta.us>, "Small-Borsellino, Sharna (EHS)"
<Sharna.Small-Borsellino@massmail.state.ma.us>, "julian.tynes@dot.state.ma.us" <julian.tynes@dot.state.ma.us>,
"Sobczynski, Gregory (DOT)" <gregory.sobczynski@state.ma.us>, "Shumovskaya, Tamara"
<tamara.shumovskaya@mrta.us>, "Jessica, Torres" <jessica.torres@mrta.us>, "Amanda-T.Kukta@MRTA.US" <Amanda-
T.Kukta@mrta.us>, "Norris, Joanne" <joanne.norris@mrta.us>, MassDOT.CivilRights@state.ma.us, eharvey@ctps.org,
DMAScheduling <dmascheduling@mrta.us>, DMAComplaints <DMAComplaints@mrta.us>, DMAinvoices@mrta.us,
scheduling@warren.senate.gov, "Handford, Everett (Warren)" <Everett_Handford@warren.senate.gov>

Attached is an Amended Federal Complaint that was filed in the Federal District Court today Titled Paul Jones v MART,
Thank you.

**Paul Jones / Director**
**Commonwealth Community**
**Recovery Division Inc.**
**79 Thompson Street**
**Springfield, Ma 01109**
**Cell: 617-939-5417**
**Toll Free: 888-680-4667**
**Fax: 888-726-8386**

**The information in this email is intended only for the person or entity to which it is addressed from CCRD INC. and may
contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of or taking of any
action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you
receive this email in error, please contact the sender and delete the material from any computers.**

[Quoted text hidden]

---

📄 **Time stamped PJ VERIFIED AMENDED COMPLAINT.pdf**
873K

# EXHIBIT 3

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3

4     Paul Jones,                  )
                   Plaintiff,      )
5                                  )
                                   )
6     vs.                          )    Case No. 19cv11093-TSH
                                   )
7                                  )
      Montachusetts Regional       )
8     Transit Authority, et al.,   )
                     Defendants.   )
9

10

      BEFORE:  The Honorable Timothy S. Hillman
11

12

                      <u>Telephonic Motion Hearing</u>
13

14

15              .

                                 United States District Court
16                               595 Main Street
                                 Worcester, Massachusetts
17                               August 13, 2020

18

19

20

21

22

                         Marianne Kusa-Ryll, RDR, CRR
23                          Official Court Reporter
                         United States District Court
24                        595 Main Street, Room 514A
                           Worcester, MA 01608-2093
25                       508-929-3399 justicehill@aol.com
                      Mechanical Steno - Transcript by Computer

2

1    APPEARANCES:

2    Paul Jones, Pro Se
     572 Park Street
3    Stoughton, Massachusetts 02072
     on behalf of the Plaintiff
4
     KP Law, P.C.
5    Deborah I. Ecker, Esquire
     101 Arch Street
6    12th Floor
     Boston, Massachusetts 02110
7    on behalf of the Defendants

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               P R O C E E D I N G S

2               THE CLERK:  Case No. 19-11093, Jones versus

3     Montachusett Regional Transit Authority.

4               Plaintiff and counsel, please note your appearance for

5     the record.

6               THE PLAINTIFF:  Paul Jones, plaintiff, pro se

7     litigant.

8               MS. ECKERT:  And this is Deborah Eckert for the

9     defendants.

10              THE COURT:  And good afternoon to both of you.

11              MS. ECKERT:  Good afternoon.

12              THE COURT:  Ms. Eckert, I believe this is your motion

13    so let me hear from you first; and then when you finish,

14    Mr. Jones, I will hear from you at that time.

15              MS. ECKERT:  Sure, your Honor.  So I don't know if

16    your Honor has had an opportunity to review the motion, but

17    I'll summarize it quickly.

18              I represent Montachusetts [sic]Regional Transit

19    Authority and the individual defendants who provide

20    transportation services to various cities and towns.

21              As part of that service, MART is a broker and engages

22    in subcontracts with companies such as Mr. Jones' company,

23    CCRD, for those brokers, vendors, and MART calls in to provide

24    services to help him and to service his clients.

25              Mr. -- Mr. Jones has filed a complaint, as your Honor

1    is aware, against MART and the various individual defendants

2    under Title VII, Chapter 151D, and then a claim for the

3    negligent infliction of emotional distress.

4            We had originally filed a motion to dismiss on the

5    grounds that MART was not Mr. Jones' and is not Mr. Jones'

6    employer.  As your Honor knows, that was denied so we're now at

7    the summary judgment stage in which we will have to take the

8    allegations contained in the pleadings as true, and so we've

9    provided a statement of fact, most of which Mr. Jones admits,

10   agrees to, in various documents attached.

11           So as regards the claims for -- under Title VII in

12   Chapter 151D, under those claims, and this was the subject of

13   the motion to dismiss, Mr. Jones has to show that the

14   transportation as MART was his employer.

15           And so now that we're able to provide an affidavit and

16   there are -- there are documents; and, in fact, Mr. Jones

17   admits to the fact that what we rely upon is more --

18           THE PLAINTIFF:  Object.

19           MS. ECKERT:  -- conditioned --

20           THE PLAINTIFF:  Object.

21           MS. ECKERT:  I'm sorry?

22           THE PLAINTIFF:  Object.  This -- I --

23           THE COURT:  Mr. Jones.  Mr. Jones, I'm going to give

24   you a -- just let me talk, please.  I'm going to give you a

25   chance to speak, and you can clarify anything you want.  I only

1    allow objections during trial.

2         Please continue, Ms. Eckert.

3         MS. ECKERT:  Sure.  So under multifactor tests there

4    are several indices of what is an employer versus otherwise;

5    and one of those or some of those has the right to control

6    where and how the work is performed, the work done, and whether

7    the work is performed on the premises, whether there's a

8    continuing relationship between the worker and employer,

9    whether the employer has a right to assign additional projects,

10   et cetera.

11        So in our statement of facts, we list several factors

12   that if you look at the responses to our statement of facts we

13   believe are undisputed.

14        And the first is that MART entered into these

15   transportation provider subcontracts not with Mr. Jones, but

16   with his company, CCRD.  So once that is performed by CCRD and

17   CCRD employees, it's not performed on the premises of MART.

18   There's no continuous relationship that MART has with

19   Mr. Jones; rather, again, the subcontract is with CCRD.  MART

20   does not have the right to assign Mr. Jones, or CCRD for that

21   matter, additional projects.

22        Rather, the way this works is that there's an

23   automated assignment system based on low cost, low rate that

24   the computer goes through basically and makes an assignment

25   when the clients of HHS needs services.

1          Let's see.  MART doesn't have the right to assign CCRD

2     additional paths other than when they're assigned

3     these -- these rides with transportation services, and MART

4     does not set Mr. Jones' hours and certainly does not set the

5     rates, which I think has caused some of the issues here for

6     Mr. Jones, because the rates -- his rates or his company's

7     rates are higher than others; and so when the automatic system

8     goes to assign transportation services, his company is not the

9     first to be selected.

10         But based on the factors and those facts that again if

11    look at the statement of facts in the response, it -- the

12    finding can be found and we believe should be found that MART

13    is not Mr. Jones' employer.

14         I do -- well, I guess I'll go through the motion

15    first, and then I'll get to the 56(f) motion that was filed.

16         Even if MART were his employer, to go even further on

17    a Title VII and a 151D claim, Mr. Jones would have to show that

18    he suffers from some adverse employment action; and again,

19    while he at this stage has said in his complaint that he has

20    been penalized, fined, et cetera, as set forth in our statement

21    of facts and supporting documentation, Mr. Jones himself has

22    not suffered an adverse action.  Again, the subcontract is with

23    CCRD, but even if that's the case, there's some -- there were

24    some fines that were imposed, but that's on CCRD, and that's

25    not on Mr. Jones.

1          The assignment of rides again is automatic based on

2   computer.  There is a call-out system, which again is done by

3   rates like the lowest rate first going up to the higher rate.

4          Mr. Jones in his complaint complains that we're using

5   his telephone number, but no doubt he would complain if we

6   hadn't used a telephone number to call out because that's how

7   the assignments are made, and he is the dispatcher for his

8   company.

9          And, finally, I'll separate out a little bit for the

10  Title VII and the 151D.  Even if there's a finding, and we

11  believe there shouldn't be, based on the undisputed facts that

12  MART is the employer, that somehow Mr. Jones versus CCRD

13  suffered an adverse action, there's no discrimination that's

14  alleged and no evidence -- well, I shouldn't say that's

15  alleged.  No evidence, of course, that is certainly no causal

16  connection based on how these rides are assigned.

17         So on Count One and -- I believe, Mr. Jones alleges

18  retaliation, and so Mr. Jones did allege from the outset that

19  he believed he was being discriminated against, and there are

20  documents now in the record that shows how that was addressed,

21  but there's nothing, and Mr. Jones has not presented evidence

22  that the conversations -- and they did spend a lot of time with

23  Mr. Jones going back and forth when he raised concerns about

24  why he wasn't getting assigned more rides, that any of those

25  conversations, that is, not being assigned rides had anything

1    or could be causally connected to his initial complaint.

2         Instead what the evidence and attached shows is that

3    they spent time with Mr. Jones.  They provided him additional

4    training to the initial training that he got that all vendors

5    get and any time that -- he did raise the concern.  Ms. Badgley

6    would go back and forth, would check it out, you know, why is

7    it that you didn't get assigned that ride, you know, suggesting

8    to him, you know, take a look at the rates.  You know, you've

9    still too high.  Maybe you should spread out to other areas, et

10   cetera.  So there's simply no causal nexus.

11        Count Two, as I understand it, is a hostile work

12   environment claim, again putting aside that it's not the

13   employer.  There are no allegations even in the complaint that

14   would create a hostile work environment based on any protected

15   category.  There's no allegations of yelling, of racial

16   comments, sexist comments, et cetera, to support such a claim.

17        And then Count Three again, as I understand it, is

18   a -- I'm trying to -- I'm having trouble reading my

19   writing -- my handwriting, but I think the disparate impact

20   claim, meaning that there needs to be a policy in place by MART

21   that has a disparate impact on a protected class saying that

22   there's a policy of discrimination doesn't do that.

23        So, for instance, if he were to say, well, the policy

24   of taking, you know, transportation providers or vendors with

25   the lowest rates somehow disparately impacts minority vendors.

1    I don't know how we would be able to say that.  That would be

2    a -- that's a policy.  It is MART policy.  We start with the

3    lowest rate.  But that's not what he's alleging.

4         Instead he's alleging the fact that he believes he's

5    discriminated against is the policy itself.  So there's no

6    policy that he anchored that disparate impact claim on that's

7    contained in the complaint.  That's Title VII.

8         Under Chapter 151D, Mr. Jones' claim is for

9    discrimination and retaliation for failure to provide a

10   reasonable accommodation.  There's nothing that I saw in the

11   complaint and nothing in the response to the motion for summary

12   judgment by Mr. Jones which identifies a -- a disability, why

13   he believes he's a qualified disabled person, but also that he

14   requested a reasonable accomodation.  So it's our contention

15   that that should be dismissed as well.

16        And, finally, for the negligent infliction of

17   emotional distress that would be brought under Chapter 258,

18   there is no presentment letter that I am aware of, so that

19   would go out or be dismissed under failure to meet that

20   prerequisite to filing a 258 claim.  Negligent affliction of

21   emotional distress under 258 is only brought against the

22   entity.  So it would be MART.  The individual employees would

23   have to be dismissed.

24        And then the basis for its claim again is

25   discrimination.  And so because there are no allegations that

1  we believe supported a discrimination claim, there's no basis

2  for that -- the claim to go forward.  You can't just -- well,

3  you can.  I mean, you can allege a claim that, you know, that

4  Mr. Jones has done that I -- you know, the negligibly

5  infliction of emotional distress by discriminating against me,

6  you have to prove the underlying discrimination first; and for

7  all the reasons I've stated before, Mr. Jones has not done

8  that.

9           So I don't know if your Honor wants me to briefly

10  address the 56(f) motion, because it might be instructive going

11  forward.  If you want me to wait.

12           THE COURT:  No, I think I want to hear from Mr. Jones,

13  and then I want to hear him on his motion for judicial notice,

14  and then I'll hear you in opposition.

15           Mr. Jones, so what do you want to say, please, sir?

16           THE PLAINTIFF:  Yes.  For the record, sir, Paul Jones.

17  And I would like to say that the defendants' attorney stated

18  that I agreed with most of her motion which is -- which I

19  don't.

20           And first of all, I would like to address Count One

21  which is Title VII.  The defendant states that I am not -- they

22  are not my employee.

23           Basically, the First Circuit Court in most -- a lot of

24  cases states that as long as they control at least one aspect

25  of the plaintiff they are -- they can be deemed an employee.

1   And they control when, where, and how the work is performed.

2   The job doesn't require high-level expertise.  The employee,

3   which there's MART, Montachusett Regional Transit Authority,

4   the employee gets in business, and they do the same business

5   that I do which is provide transportation.  The employee can

6   discharge the worker.  The worker -- the employee believes that

7   they have created an employee-employer relationship, which I

8   did.

9          So even if they control one aspect of our

10   relationship, which they did, your Honor, they -- you know,

11   they say my rates were higher than other people's.  That's not

12   true.  All this is talk.  We tell each other what the bids are

13   and everything.

14          If you look at my complaint, I put in a $10 bid.  They

15   have in their possession all of the documents that show

16   everybody's bid.  They could have easily put in a list of all

17   the bids and said, see, your Honor, it's still better.  A $50

18   bid, and they had a $10 bid; that's why they did it.  So it's

19   in dispute, your Honor, and they controlled at least one aspect

20   of our relationship on a day-in, day-out basis.

21          And as far as the discrimination, your Honor, again,

22   this is summary judgment.  I haven't had a chance to propound

23   discovery.  If any documents all the -- the defendants have all

24   the documents in their possession for me to prove that they

25   discriminated, retaliated, and caused a work -- a hostile work

1   environment, your Honor.

2          And it's -- the Chapter 151, that's on the other

3   defendants except Montachusett Regional Transit Authority; and,

4   your Honor, Chapter 1 -- 151D, as you know, they filed a motion

5   to dismiss, and there was an R and R report was suggested that

6   I to be able to amend the complaint to reflect the Chapter 151

7   filing these violations, and I have several, your Honor.

8          Your Honor, I was hospitalized over this.  I have

9   all -- you know, and I haven't had a chance to get the records

10   from the hospitalization.  So I've made the allegation.  And

11   during discovery, I will give them all of that, you know.

12          And the retaliation, your Honor, once I filed -- once

13   I took an action and filed a complaint against them, they never

14   gave me any work.  They decimated me.  They wouldn't give me

15   work for months.  All of the staff had to be laid off after I

16   got all the insurance, after I had all the drug tests done,

17   after I paid for training; and they retaliated against me, your

18   Honor.  And once I spoke up about it, they really started

19   retaliating on me.

20          When I went to training at MART, which all the vendors

21   do, I arrived for training.  They told me that you don't --

22   you're not training today.  You're going to wait for Karen

23   Cordio to train you while all the other vendors went in for

24   training.

25          So weeks later I go in for training.  She didn't train

1   me properly.  She took me into her office.  She questioned me.

2   She wants to know my whole history.  Ninety percent of the

3   meeting was not about the vendor portal or policy at MART.  I

4   was lost.  I couldn't understand what was going on.

5           So, then, she told me that oh, the portal's down.

6   I'll tell you what's -- how it is really easy to figure out.

7   And as the defendants' attorney said, oh, they tried to

8   accommodate him and meet with him a few times.  Your Honor, I

9   had to fight to get training.  I -- I -- you know, I asked them

10  five or ten times.  They didn't want to do it.

11          I went to MassHealth, sent letters to MassHealth.

12  MassHealth got involved and said, listen, you need to give this

13  guy proper training.  He needs to sit in front of the vendor

14  portal like everybody else.  Give him a screen shot of the

15  vender portal.  Show him an example,  you know, and it's really

16  easy, your Honor, for the portal to work, you know, but there

17  are certain things that you need to know.

18          As far as rates, your Honor, I've had a lower rate

19  than 90 percent of the vendors.  They give you a rate card with

20  everybody's rates.  They just take the names off.  So all you

21  have to do is look at it and say, okay, if everybody's bidding

22  15, I'm not getting any work, I'm going to bid ten.  And then

23  once I did that, two months went by, and they're like, oh, we

24  overlooked your ten.  They admit it, they overlooked it, you

25  know, so the retaliation has been going on; and if you look at

1    my complaint, your Honor, I put a letter in there, an email

2    from Ivan Roman, who was the manager, my manager at MART, and

3    he wanted me to pay him on the side to train him properly to

4    show him how to defend against MART if I was having problems

5    with my vendor portal not receiving rides, which he knew I did.

6    That's very telling, your Honor.   These people need to be

7    deposed, you know.

8        So the discrimination, I made the allegation of

9    discrimination, and I also made the allegation that out of

10   250-plus vendors maybe about 20 or 15 are African-American

11   males.   African-American males.   They have foreigners, but

12   hardly any African-American males, your Honor.

13       From the onset I think it's discriminated again.

14   That's why I made the complaint.   I tried over and over to talk

15   with them to get things done, and it was just like she said, as

16   far as the phone call, retaliation, discrimination.   Sure.   I

17   had hired a phone operator that sat in the office, and they

18   refused to call her.   Instead, they called me on my cell phone

19   while driving.   Not once, not twice, not ten, not 20 times a

20   day.   50 to a hundred times a day.   And I told them I have a

21   dispatcher in the office, can you please call her.   And it's,

22   like, you know, hanging up the phone, and that's discrimination

23   and retaliation.   And if we -- I can have discovery we can

24   flush all this stuff out.   I made all these allegations in the

25   complaint, your Honor.

 1          And like I said this is summary judgment.  They have

 2     all of the evidence in their possession.  All of it.

 3          THE COURT:  Mr. -- Mr. Jones, you know that discovery

 4     is -- is closed, right?

 5          THE PLAINTIFF:  Closed?

 6          THE COURT:  Yes, sir.

 7          THE PLAINTIFF:  I never had --

 8          THE COURT:  No, just listen.  Just listen.  There's a

 9     scheduling order that sets out the various -- the -- the -- the

10     dates by which certain things have to be accomplished,

11     and -- and one of those is that discovery is closed.  I mean,

12     that's why we have summary judgment.  We wait until the

13     discovery is -- has closed.

14          THE PLAINTIFF:  Your Honor, I have dockets, I have a

15     copy of the docket.  There was never a schedule for discovery,

16     your Honor.  It went straight from after the R and R

17     maintenance report and suggested that I amend my complaint.  We

18     amended the complaint.  I amended the complaint.  She filed a

19     summary judgment right after that.  In my opposition to her

20     summary judgment, I point that out.  That's why -- that's why I

21     invoke Rule 56(f).

22          THE COURT:  All right.  Okay.  All right.

23          THE PLAINTIFF:  There was -- there was the evidence of

24     the schedule, sir.

25          THE COURT:  All right.  Thank you.  I'll -- I'll check

1   that.

2           THE PLAINTIFF:  Yeah.

3           THE COURT:  Talk to me about your motion for judicial

4   notice.

5           THE PLAINTIFF:  Yes, my motion for judicial notice

6   that I filed is I would like the Court to take notice of this

7   because this is paramount, and it's directly tied into my

8   complaint.

9           In 2016 -- like I said, vendors talk.  We're a very

10  small group of people, but we communicate amongst each other.

11  That's how everybody knows everybody's age and what they're

12  doing.

13          So anyway, 2016, after I kept trying to work it out

14  with MART, they wouldn't work it.  I said I've got to get the

15  people involved.  I reached out to MassHealth.  They got me

16  proper training.  Well, they got me another session for

17  training.  And then when I went there, that didn't work.

18          So anyway I reached out to the Department of Justice

19  and I just told them, look, these people are getting federal

20  money.  They're not accommodating.  They're not allowing me to

21  participate in the program.  I'm spending all of my -- I was

22  going to get married.  I spent all my wedding money on

23  everything, like, on expenses.  So I reported to the Department

24  of Justice that -- and they said, Well, what are they doing

25  illegal?  And I said, Well, they're doing a bunch of stuff

1    illegal.  They're letting -- they're letting nonminority

2    vendors have two to three companies, and you can verify that

3    from the secretary of state.  They're telling me there's no

4    work when they have these nonminority vendors with two to four

5    companies taking more work than they can handle; and then what

6    they do is they take 200 calls a day, when I don't get ten, and

7    they'll send a hundred out to Uber and Lyft, which is illegal,

8    because only a certified vendor with livery plates, training,

9    can pick up a client.

10        So they were sub -- they were just giving it to Lyft,

11   Lyft charging $7, and they were billing for $30, while I'm on

12   the sidelines begging and pleading for work at a higher price.

13        So this July this past, they came to a settlement with

14   MART.  I guess they've been investigated, and they found out

15   that it was true, and MART said, okay, we're going to settle

16   this.  We don't know which ones did it, but we'll settle for

17   300,000.

18        They got one gentleman who had multiple companies,

19   multiple companies, and was taking all of these trips that he

20   couldn't even handle and pass them onto Lyft and Uber, and Uber

21   is charging seven to $10, and he's charging 20 to $30, which is

22   illegal.  And this was reported to MART plenty of times.

23        I have clients that I will give her in discovery, if I

24   ever get a chance to get there.  And I didn't get a chance to

25   do a scheduling conference and get her discovery.  I will give

1    her a list of clients that have Uber and Lyft from various

2    companies, nonminority companies, day in and day out, and they

3    have reported it to MART, and they did nothing.  And the

4    Department of Justice, the FBI, the Massachusetts branch of the

5    FBI and the Attorney General for the United States and

6    Massachusetts went in, gave -- laid the evidence out.  I know

7    they did research.  They did discovery with them, too, which I

8    would like to propound from them.  And I know they'd gladly

9    give it to me that show that, yeah, you allowed these people,

10   two or three companies, astronomical rates, take all these

11   calls, and you should have known that they didn't have the

12   capacity, because you know how many vehicles they've got.  But

13   they were calling Uber, Lyft, and things of that nature.  And

14   this has been going on and on with MART.  This is the only

15   time.  The same people are there are the same people that was

16   there when the Attorney General arrested three of the

17   scheduling department defendants about seven to ten years ago

18   for allowing a nonminority vendor to have four or five

19   companies in his name, and they were giving him money, and they

20   were giving him all the calls.

21          Now, I'm not suggesting that MRTA's taking money under

22   the table, but that's not for me to --

23          THE COURT:  So -- so your -- I think you've answered

24   my question about the judicial notice.

25          Is -- had you -- have you finished on that?  You're --

1   you're going a little bit off the track.

2          THE PLAINTIFF:  Yeah, I'm finished with that, your

3   Honor, but I would like to point out, your Honor, that I

4   haven't had a chance -- will I be able to speak on the motion

5   for Rule 56(f) that I filed?

6          THE COURT:  Sure.  Why don't you do that now.

7          THE PLAINTIFF:  Okay.  The Rule 56(f), I invoked that

8   because, your Honor, they filed a -- I filed -- I filed a

9   complaint.  Before they answered, I amended it.  They filed a

10  motion to dismiss.  I filed an opposition.  It went to the R

11  and R, the magistrate.  He wrote up an R and R report that

12  said, Mr. Jones -- he dismissed my PCPA claim and said,

13  Mr. Jones, Title VII retaliation, discrimination on opt-out

14  work area should stand, and he should have a chance to amend

15  his Chapter 151D last claim for retaliation.  I did that.

16         Upon me filing the second amended complaint, I

17  immediately filed a summary judgment motion.  I have not had a

18  chance to get any discovery.  Ninety-nine percent of the

19  discovery is in their possession.  They have a vendor portal

20  with the click of a button they can print out all the vendors'

21  names from -- all the vendors' companies names, every ride they

22  had, the price they had from 2015 to 2019 and mine.  And they

23  can have the cheapest one all the way down to the expensive

24  one.  And they could -- that would show a bulk of the problem.

25         And also, I invoked it because I haven't had a chance

1    to get discovery.  And, your Honor, there's no -- there was no

2    conference set up.  We haven't had -- even had a scheduling

3    conference, you know.  And I think you should put this on hold

4    until we have a scheduling conference, we have discovery, and

5    then the summary judgment can come.  And I will welcome that,

6    and, you know, give me a chance to get discovery to prove my

7    claims because a lot of this stuff I really don't even have to

8    get it from -- well, I have to get it from MART, but I can get

9    it from other people, like MassHealth, the Department of the

10   Attorney General, the Attorney General of Massachusetts, the

11   Executive Office of Health and Human Service.  They'll show all

12   the rates, all the checks that everybody got, who had the

13   lowest and everything.  And I would like to depose their --

14   their portal operator that operates the system, because with a

15   click of a mouse, your Honor, they could block you out.  You

16   can get no calls, and that will show who had access to the

17   vendor portal and who only had access to call.

18          Getting a call and saying, oh, we've got a ride, an

19   automated dialing caller says, we've got five rides with you,

20   and how I can take them within a minimum of five minutes.  It's

21   impossible.  It's impossible.  And basically, I was being used

22   as a -- after all these guys, the nonminority vendors took

23   their trips, anything that they couldn't make they will call me

24   the same day or the next day and ask me to pick up someone.

25   And when I will pick them up they would say, oh, Worcester was

1   supposed to pick us up.  Well, this one they didn't show, and,

2   you know, the Rule 56(f) should stand, and summary judgment

3   should be put off until we have a scheduling conference and a

4   chance for discovery, your Honor, you know.

5          Discovery will be short.  We only need six months to

6   do it, and it's very -- the documents I want from them they

7   will be very access -- very easy to access, you know.  And

8   I'm -- I'm ready and willing and able to give all my documents,

9   deposed, whatever, but I really need discovery to oppose this

10  summary judgment.  I haven't had a chance.

11         THE COURT:  Thank you -- thank you, Mr. Jones.

12         THE PLAINTIFF:  You're welcome.

13         THE COURT:  Ms. Eckert, I'll give you a brief

14  rebuttal, and you can argue about the motion for judicial

15  notice.

16         MS. ECKERT:  Okay.  Your Honor, we filed an opposition

17  to the 56(f), so we'll rely on that.  There was a response to

18  our statement of undisputed facts, and so the information in

19  response to that is contained in our opposition to the 56(f).

20         As far as the judicial notice, different counsel

21  entered into the settlement, and my understanding is and in

22  reviewing the documents that Mr. Jones filed, one is different

23  management now; but, two, there's nothing in those documents

24  that talks about discrimination.  My understanding is that they

25  were fined for poor oversight realistically, that they allowed

1  these vendors, and there's nothing in there that says whether

2  they're minority or not to assign by -- by Uber and Lyft, and

3  so that's my understanding.

4         There's also no information and MART is not aware that

5  Mr. Jones was involved in any way, if that was one of the

6  reasons to take judicial notice.  So that would be our position

7  that it's just not relevant to Mr. Jones' claims.

8         THE COURT:  All right.  Thank you, everybody.  We're

9  going to take it under advisement.  Good job.

10         MS. ECKERT:  Thank you, your Honor.

11         THE PLAINTIFF:  Thank you very much, your Honor.  Have

12  a nice day.  Bye.

13         (At 3:15 p.m., Court was adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25

23

1                    C E R T I F I C A T E

2

3          I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4    certify that the foregoing transcript is a true and accurate

5    transcription of my stenographic notes before the Honorable

6    Timothy S. Hillman, to the best of my skill, knowledge, and

7    ability.

8

9

10   /s/ Marianne Kusa-Ryll                    08/13/2020

11   Marianne Kusa-Ryll, RDR, CRR              Date

12   Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 4

Case 1:20-cv-12076-TSH  Document 9-1  Filed 12/24/20  Page 34 of 46

 United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE
# DISTRICT *of* MASSACHUSETTS

U.S. Attorneys » District of Massachusetts » News

**Department of Justice**

U.S. Attorney's Office

District of Massachusetts

FOR IMMEDIATE RELEASE      Tuesday, July 21, 2020

# Transportation Broker For MassHealth Agrees to Pay $300,000 to Resolve False Claims Allegations

## Montachusett Regional Transportation Authority allegedly submitted reimbursement claims for transportation that was never provided

BOSTON – The Montachusett Regional Transportation Authority (MART), a transportation broker for MassHealth, has agreed to pay $300,000 to resolve allegations that it violated the False Claims Act by submitting reimbursement claims for rides that never happened.

As a state Medicaid program, which the federal government jointly finances, MassHealth must provide its members with non-emergency transportation to and from medical appointments that MassHealth covers. MassHealth uses transportation brokers, including MART, to help its members find these rides. MART in turn contracts with third-party transportation companies to provide rides to MassHealth members. MART pays the transportation companies for the rides and submits reimbursement claims to MassHealth for the costs of the rides. In addition, MassHealth's parent agency, the Executive Office of Health and Human Services (EOHHS), pays MART a management fee for its brokerage services.

The government alleges that, from Jan. 1, 2011 through Dec. 31, 2015, MART submitted reimbursement claims to MassHealth for thousands of rides that MART's contracted transportation companies did not actually provide. MART's contract with EOHHS required MART to have "procedures to verify that scheduled trips were performed as authorized and as billed, and that the Transportation Provider performed Consumer trips in a timely and satisfactory manner." According to the allegations in the settlement agreement, however, MART's verification procedures were not sufficient to prevent transportation companies from submitting false invoices to MART, resulting in MART then billing the invoiced amounts to MassHealth.

"MART obtained reimbursement from MassHealth for services that its vendors did not actually deliver," said United States Attorney Andrew E. Lelling. "We expect companies doing business with the government to comply with their contractual obligations. This office will continue to pursue those responsible for undermining the benefits that the government has bargained for."

"The Medicaid program provides health care benefits to low-income individuals and families. Billing for transportation services that were never provided is a waste of valuable taxpayer funds that are intended to provide critical services to those in need," said Special Agent in Charge Phillip M. Coyne of the U.S.

Department of Health and Human Services Office of Inspector General. "This settlement is an example of how the State and the Federal government can work together to recoup and deter overbilling practices."

"Not only did the Montachusett Regional Transportation Authority try to steal from a government program intended to support a vulnerable population, but they saddled taxpayers with the bills," said Joseph R. Bonavolonta, Special Agent in Charge of the Federal Bureau of Investigation, Boston Division. "Today's settlement underscores the FBI's commitment to working with our law enforcement partners in rooting out Medicaid fraud and ensuring that businesses aren't taking more than what they have legitimately earned."

U.S. Attorney Lelling, Massachusetts Attorney General Maura Healey, HHS-OIG SAC Coyne and FBI Boston SAC Bonavolonta made the announcement today. The matter was handled by Assistant U.S. Attorney Evan Panich of Lelling's Office.

---

**Component(s):**
USAO - Massachusetts

Updated July 21, 2020

12/24/2020    Montachusett Regional Transit Authority to Pay $300,000 to Resolve Allegations of Submitting False Claims to MassHealth | Mass.gov

Case 1:20-cv-12076-TSH   Document 9-1   Filed 12/24/20   Page 36 of 46

EMERGENCY ALERTS

## Coronavirus Updates and Information

Sign-up for COVID-19 alerts: Get notified by text, email, or phone in your preferred language. *Dec. 5th, 2020, 5:00 pm*

**Read more**◆

---

For the latest information on COVID-19 Cases, Restrictions, Business Relief *Dec. 23rd, 2020, 5:00 pm* **Read more**◆

HIDE ALERTS

## Mass.gov

.

PRESS RELEASE

# Montachusett Regional Transit Authority to Pay $300,000 to Resolve Allegations of Submitting False Claims to MassHealth

## Settlement is the Result of a Joint Investigation with the U.S. Attorney's Office

FOR IMMEDIATE RELEASE:
7/21/2020

Office of Attorney General Maura Healey

MEDIA CONTACT

**Alex Bradley**

**Phone**

(617) 727-2543 (tel:6177272543)

**Online**

**alexander.bradley@mass.gov** (mailto:alexander.bradley@mass.gov)

**BOSTON** — Attorney General Maura Healey announced today that the Montachusett Regional Transit Authority (MART) will pay $300,000 to resolve allegations that it improperly caused false claims to be submitted to the state's Medicaid program (MassHealth).

In a joint settlement agreement with the Massachusetts Attorney General's Office and the United States Attorney's Office for the District of Massachusetts, MART will pay $300,000 to resolve allegations that, from January 1, 2011 through December 31, 2015, the organization billed for and received reimbursement from MassHealth for thousands of rides that its transportation subcontractors did not provide to MassHealth members. The AG's Office also alleges that MART was in violation of its contract with the state, as it did not have appropriate procedures in place to verify that these transportation subcontractors had actually provided the rides, as billed to MassHealth.

"Some of our most vulnerable residents rely on MassHealth to provide essential healthcare services, and we need those dollars to be spent properly," said AG Healey. "Any organization that does business with the state must honor its contracts and put appropriate compliance protocols in place to ensure that the state money is not being misused."

MART is a quasi-public transportation authority that provides mass transit options and brokers medical transportation via subcontractors for the cities of Fitchburg, Gardner, and Leominster and the towns of Ashburnham, Ashby, Athol, Ayer, Bolton, Boxborough, Hardwick, Harvard, Hubbardston, Lancaster, Littleton, Lunenburg, Royalston, Shirley, Sterling, Stow, Templeton, Westminster, and Winchendon.

Improper billing in medical transportation continues to be a priority of AG Healey's Medicaid Fraud Division. This month, the AG's Office **announced** (/news/newton-transportation-company-resolves-claims-of-improperly-billing-masshealth-for-wheelchair) that a Newton company will pay $27,000 to resolve allegations of improperly billing MassHealth for medically necessary wheelchair van rides actually provided by Uber and Lyft. In November, Michael Davini, the owner of Rite Way Transportation company, was **sentenced** (/news/transportation-company-owner-sentenced-to-jail-for-multi-million-dollar-medicaid-fraud-scheme) to jail after pleading guilty to charges in connection with a scheme to steal millions from MassHealth by way of kickbacks and billing for services not rendered.

In AG Healey's Office, this matter was handled by Managing Attorney Kevin Lownds, of the Medicaid Fraud Division, with substantial assistance from the U.S. Department of Health and Human Services, Office of the Inspector General, the Boston Field Office of the Federal Bureau of Investigation, and MassHealth.The Medicaid Fraud Division receives 75 percent of its funding from the U.S. Department of Health and Human Services under a grant award. The remaining 25 percent is funded by the Commonwealth of Massachusetts.

###

# Media Contact

### Alex Bradley

#### Phone

(617) 727-2543 (tel:6177272543)

#### Online

Case 1:20-cv-12076-TSH   Document 9-1   Filed 12/24/20   Page 38 of 46

**alexander.bradley@mass.gov** (mailto:alexander.bradley@mass.gov)



**Office of Attorney General Maura Healey** (/orgs/office-of-attorney-general-maura-healey)

Attorney General Maura Healey is the chief lawyer and law enforcement officer of the Commonwealth of Massachusetts.

**More** (/orgs/office-of-attorney-general-maura-healey)

# EXHIBIT 5

# telegram.com
WORCESTER, MASSACHUSETTS

# Businessman, 3 MART employees indicted in alleged scam

**By George Barnes TELEGRAM & GAZETTE STAFF**
Posted Sep 24, 2010 at 2:23 PM
Updated Sep 24, 2010 at 5:45 PM

A Newton man who owns five transportation businesses was indicted today by a Worcester County Grand Jury for allegedly paying kickbacks to employees of the Montachusett Regional Transit Authority to get them to divert transportation services to one of his companies.

The services were paid for through the state's Medicaid program.

Alex Shrayber, 55, was indicted on two counts of taking Medicaid kickbacks and four counts of offering corrupt gifts, offers or promises to influence the acts of officials, Attorney General Martha Coakley announced today.

Three women who worked for MART were also indicted today in connection with the scheme.

Investigators in the attorney general's office allege that Mr. Shrayber made cash payments to MART employees between January 2007 and April 2010. They said the monthly payments were made to influence the employees to bypass the authority's low-bid system and divert transportation assignments for MassHealth recipients from other companies to one of Shrayber's five transportation businesses.

"The non-emergency transportation services offered by MassHealth provide access to a full range of medical services, from routine physician visits to dialysis treatments," the attorney general said in a press release. "We allege the defendants engaged in a scheme that resulted in higher costs for taxpayers and our Medicaid program, while also compromising the public integrity of the bidding process."

Case 1:20-cv-12076-TSH Document 9-1 Filed 12/24/20 Page 41 of 46

The MART employees indicted are Maria Gutierrez, 50, of Fitchburg, and Nancy Osorio, 33, and Leanna Swift, 28, both of Leominster. They each face charges of accepting Medicaid kickbacks and two counts of accepting corrupt gifts, offers or promises to influence acts of officials

Mr. Shrayber was arrested July 20 and arraigned in Leominster District Court on one count each of Medicaid fraud kickbacks and bribery in connection with the scheme. On Aug. 27, he was arraigned in Fitchburg District Court on the same charges.

MART administrators have cooperated with the ongoing investigation.

Mr. Shrayber's businesses are Delta Community Transportation, Women in Transit, East-West Transportation, IBF Transportation, and New England Trans Services.

The Massachusetts Medicaid Program, the Department of Public Health and the state police assisted in the investigation.

# EXHIBIT 5



**Need exclusive stories only we can tell? Subscribe to MassLive.com.**

Advertisement

**Springfield**

# Westfield Transport, Massachusetts company involved in New Hampshire crash that killed 7, has history of violations, federal records show

Updated Jun 25, 2019; Posted Jun 24, 2019

Bikers bid goodbye to 7 motorcyclists killed in New Hampshire crash

## 2,509
shares

By **Melissa Hanson | mhanson@masslive.com**

Federal records indicate a Massachusetts company that employs a driver who was behind the wheel in a devastating crash in New Hampshire, which left seven people dead, has a history of violations.

Volodymyr Zhukovskyy, 23, was driving a black 2016 Dodge 2500 pickup truck with an attached trailer designed for carrying cars in Randolph, New Hampshire, on Friday when the truck slammed into a group of 10 motorcycles, killing seven people, including a Massachusetts couple.

Advertisement

On Monday morning, Zhukovskyy was arrested at his West Springfield home. He is being charged with seven counts of negligent homicide, for which he will face a judge in New Hampshire.

Massachusetts couple Joanne and Edward Corr among 7 killed in New

**Hampshire motorcycle crash**

Coos County Attorney John McCormick said during a weekend press conference that the investigation of the crash will look at the conduct of Zhukovskyy and the company he works for, Westfield Transport, Inc., in West Springfield.

Records from the Federal Motor Carrier Safety Administration indicate that the company has faced various violations in the last two years, including two instances where drivers were in possession of narcotic drugs.

A man who answered the phone at a number listed for Westfield Transport on Monday afternoon said he was on the other line with state police and hung up when asked for a comment.

During inspections on March 9, 2018, and March 12, 2018, a driver was found in possession of a narcotic drug, amphetamine, according to the federal records. Those inspections happened in Vermont and Massachusetts, respectively.

A photo from the scene of Friday's crash showed license plate S26138 on the Westfield Transport pickup truck.

Advertisement

Federal records indicate that license plate number was involved in the March 9 and 12 inspections, when the driver was in possession of amphetamine.

The federal records do not list drivers who were behind the wheel during the inspections.

Other inspections led to the discovery of vehicle maintenance violations including

Other i... ...uding inoperative or defective brakes, drivers who did not have a required CDL license and unsafe driving violations like failure to stay in a lane and speeding 11 to 14 miles per hour more than the speed limit, according to records.

Over the weekend, officials said they could not release many details about the investigation, including whether drugs or alcohol may have been factors in the crash.

When Zhukovskyy was arrested Monday morning, Massachusetts State Police found wax packets containing a residue that authorities believe is heroin in his home.

As of Monday afternoon, Zhukovskyy is not facing any drug charges. If the residue tests positive as an illegal narcotic, Zhukovskyy will face drug charges, state police said.

The crash has rocked both the veteran and motorcycle communities.

Those killed were members or supporters of the Marine JarHeads, a New England motorcycle club that includes Marines and their spouses.

Authorities have identified the victims as Jo-Ann and Edward Corr, both 58, of Lakeville, Massachusetts; Michael Ferazzi, 62, of Contoocook, New Hampshire; Albert Mazza Jr., 59, of Lee, New Hampshire; Desma Oakes, 42, of Concord, New Hampshire; Aaron Perry, 45, of Farmington, New Hampshire; and Daniel Pereira, 58, of Riverside, Rhode Island.

About 400 paid tribute to the victims during a Blessing of the Bikes ceremony on Sunday.

*Material from The Associated Press was used in this report.*